**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-11280

_____

MOHAMMAD SHARIFI,

*Petitioner-Appellant,*

*versus*

WARDEN, HOLMAN CORRECTIONAL FACILITY,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:17-cv-01924-AMM

_____

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Mohammad Sharifi was convicted in an Alabama state court of the murder of two people and sentenced to death. Although the murders occurred in December 1999 and Sharifi was arrested shortly afterward, he was not tried until January 2005, more than

five years after his arrest. He appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus in which he claimed that his Sixth Amendment right to a speedy trial was violated. After careful consideration, and with the benefit of oral argument, we affirm.

## I. Facts and Procedural History

Sharifi, an Iranian national, moved to Huntsville, Alabama, in December 1998. He married Sarah Kay Smith in April 1999, but they split later that year. Smith, then Smith Sharifi, was found dead in the Tennessee River that December. FBI agents arrested Sharifi in Los Angeles, California on December 28, 1999, on an unlawful-flight-to-avoid-prosecution warrant connected to her murder. Evidence in Sharifi's possession at the time of his arrest also connected him to the murder of Smith Sharifi's friend, Derrick Brown, whose body was recovered from the Tennessee River in January 2000.

Because this appeal presents a speedy trial claim, in the next section, we detail what occurred during the 61 months between Sharifi's arrest and his trial for the murders of Smith Sharifi and Brown. We then review the proceedings in Sharifi's trial. After that, we discuss Sharifi's direct appeal in which he challenged his conviction on speedy trial grounds and his federal habeas proceedings in district court.

### A. Pretrial Proceedings

Sharifi was extradited to Alabama on January 21, 2000. Upon his return, he was charged with capital murder. He was initially represented by Fred Simpson. After Simpson filed a motion to

withdraw from representing Sharifi in March 2000, the court appointed Robert and Patrick Tuten as Sharifi's counsel.

Although Sharifi had not yet been indicted on any murder charges, the Tutens filed motions requesting discovery from the State and asking the court for an order directing the State to preserve evidence. Around this time, Sharifi submitted to the court a handwritten pro se request for a speedy trial.

Even though Sharifi was arrested in December 1999, the State did not present his case to a grand jury until February 2001. The State apparently waited to present the case to a grand jury until various forensic reports were completed because the prosecutors knew that the state court judge would not grant a continuance to wait for the reports. Sharifi was indicted on March 9, 2001, more than 14 months after his arrest.

The indictment charged Sharifi with the murders of Smith Sharifi and Brown. He pleaded not guilty.

In April 2001, following the indictment, Sharifi's counsel filed a slew of motions, including another request for production. The State filed its own motion for discovery, and it responded to Sharifi's discovery requests in August. It began producing documents, which included police and toxicology reports.

Also in April 2001, Sharifi's counsel filed a motion to have him undergo a diagnostic evaluation and mental health examination to determine his competency to stand trial and his mental condition at the time of the offenses. They attached to the motion Sharifi's medical records from Iran, which showed that he had

received diagnoses for mental health conditions and taken psychiatric medications. The trial court promptly ordered a mental evaluation and suspended the criminal proceedings until a report about Sharifi's mental condition was submitted to the court.

While waiting for the report from the mental evaluation, Sharifi's counsel continued to file motions in the state court. They filed *ex parte* motions requesting funds to hire a psychiatrist and psychologist to assist with Sharifi's mitigation case and to travel to California and Iran to find alibi witnesses and build a mitigation case. They asserted that traveling to Iran was the "only reasonable method" of gathering and preparing mitigation evidence. Doc. 11-13 at 31.[1] Sharifi's counsel also filed a motion asking for a jury to determine whether he was competent, but this motion was later withdrawn. His counsel also filed a notice requesting that Sharifi be present at all pretrial hearings and conferences. And they requested that he have an interpreter present at all court proceedings.

After the events of September 11, 2001, Sharifi's counsel filed a supplement to its request for funding to travel to Iran. The supplement asserted that the tragedy "ma[d]e such a trip even more necessary" given the likely prejudice against Muslims and people of Middle Eastern descent. *Id.* Despite seeking these travel funds, counsel acknowledged the dangers of traveling to Iran. They concluded the motion by stating that "any such trip [to Iran] will not, and cannot, be taken in the immediate future." *Id.*

---

[1] "Doc." numbers refer to the district court's docket entries.

Around six months after it was requested, in October 2001, Sharifi underwent his outpatient mental evaluation. Dr. Melissa Clinger conducted the evaluation and submitted a report to the court a few days later. She was unable to determine definitively whether Sharifi was fit to stand trial, though she stated that she did not believe that he could adequately work with his attorneys because he denied knowledge of basic legal facts. Clinger suggested that this difficulty was "due at least in part to some form of psychiatric disorder." Doc. 11-13 at 44. She also noted documented proof that Sharifi had been treated for a serious mental illness in Iran. Even so, her report suggested a "possibility of the exaggeration of symptoms or malingering." *Id*. at 47. Given these inconclusive results, Clinger recommended that Sharifi be admitted to Taylor Hardin Secure Medical Facility for a more thorough, inpatient assessment. She did not conduct an evaluation of Sharifi's mental state at the time of the alleged offenses. She recommended that such evaluation also be completed at Taylor Hardin.

Around the same time Clinger submitted her evaluation, Sharifi's attorneys filed several other motions. They filed an additional motion seeking discovery because it appeared that the State had not turned over all discoverable material. They also requested funds to travel to Washington, D.C., to meet with representatives from the Iranian Interests Section of the Pakistani Embassy.

After receiving Clinger's recommendation, the court entered an order moving the case to its administrative docket. Sharifi's counsel again objected, citing his right to a speedy trial and

asserting that the court's decision would cause further delay. After receiving the objection, the court did not remove the case from its administrative docket. In late October, the court ordered Sharifi to Taylor Hardin for an inpatient evaluation. The order directed that the case be continued until the court determined whether he was competent.

Sharifi was admitted to Taylor Hardin on December 3, 2001, where he remained until January 18, 2002. At Taylor Hardin, a team of providers evaluated him. Dr. Kamal Nagi prepared a forensic evaluation report detailing the providers' findings. Nagi assessed both Sharifi's competence to stand trial and his mental state at the time of the offenses. Regarding Sharifi's competence, Nagi determined that he was capable of assisting his counsel and understanding the United States court system. Although Sharifi denied knowing the answers to basic questions, Nagi noted that when he was not being formally evaluated, he "was able to discuss a variety of issues related to his legal proceedings in an intelligent manner." Doc. 11-13 at 70. Nagi further concluded that Sharifi's exaggerated responses to questioning and presentation on psychological tests "indicated that he is malingering and has set his mind on avoiding trial and being found incompetent." *Id.* at 67.

As to whether Sharifi was suffering from a severe mental disease or defect at the time of the alleged offenses, Nagi found that he was not. According to Nagi, Sharifi reported experiencing "everything in the textbook about Schizophrenia." *Id.* at 66. Nagi suggested that Sharifi may suffer from a personality disorder, but he

ultimately found that "there was no clear evidence of any type of major mental illness." *Id*. at 69–70. Nagi determined that the "questionable endorsement and presentation of a multitude of inconsistent symptoms" indicated malingering. *Id*. at 70. Despite being able to describe events before and after the crimes, Sharifi reported that he had no memory of the alleged crimes' time frame. Nagi determined that the reported memory loss was "not a symptom fully consistent with any major mental illness" that Sharifi said he had in the past. *Id*. at 69. Nagi concluded that Sharifi's ability to differentiate right from wrong was uncompromised at the time of the offenses.

In February 2002, after Sharifi's release from Taylor Hardin, the court moved the case off its administrative docket. Sharifi's counsel moved again for a jury to determine Sharifi's mental state, expressing disagreement with the results of Nagi's evaluation. This motion was later withdrawn. The same month, Sharifi's counsel filed a motion to allow a representative of the Iranian consulate to visit Sharifi in jail.

A second motion hearing was held on March 21, 2002. One purpose of the hearing was to take evidence so the court could determine whether Sharifi needed an interpreter. But, due to the court's failure to notify the sheriff about the hearing and staffing problems at the jail, Sharifi could not be brought to court for the hearing. Over defense counsel's objection, the court continued the evidentiary hearing.

The court nonetheless used the March 21 hearing to address other pending motions. At the hearing, Sharifi's counsel reported that they had received some, but not all, of the anticipated discovery. They represented that they still had not received access to physical documents that were recovered from Sharifi's briefcase, which was seized in California. In response, the State maintained that it had fulfilled its discovery obligations but acknowledged that it had not yet coordinated with defense counsel so that they could review the requested physical documents. The State agreed to promptly coordinate the defense's access to these documents.

The court rescheduled the evidentiary hearing on Sharifi's need for an interpreter for April 11, 2002. Apparently, defense counsel misunderstood the purpose of the hearing and failed to have their witnesses present. So, instead, the court heard arguments on other pending motions. Many of the issues the motions presented related to discovery; defense counsel maintained that they had still not gotten access to the physical documents previously requested. The court ordered the State to provide the defense with a copy of its case file within 60 days. Shortly after the hearing, the State allowed defense counsel to view the documents recovered from Sharifi's briefcase, and it provided them with copies of the documents in June.

At this hearing, Sharifi also requested that the State turn over autopsy photos of the victims. The State revealed that it did not yet have all the autopsy photos. It assured Sharifi's counsel that it would turn over the photos as soon as it obtained them.

In July 2002, Sharifi's counsel sought a third mental evaluation. They filed a motion to allow Dr. Marianne Rosenzweig, a forensic psychologist, to visit Sharifi at the jail to assess his competency to stand trial. The court promptly granted this motion.

Rosenzweig completed her competency evaluation on August 29 and provided defense counsel with a report in September. She wrote that Sharifi's "self-reported symptoms do not usually occur in the combinations he reports in bona fide cases of mental illness" and that he did not demonstrate the "gross incapacities in mental functioning that would be expected in someone who was genuinely experiencing these symptoms." Doc. 11-17 at 140. She readministered some of the formal assessments that Nagi had administered while Sharifi was at Taylor Hardin. Rosenzweig similarly concluded that Sharifi's results on these assessments indicated that he was "deliberately feigning incompetence." *Id*. Based on these tests and the interviews she conducted with Sharifi and jail staff, she was unable to identify any "true impairment in his ability to assist counsel." *Id*. at 141. Nonetheless, like Clinger, Rosenzweig confirmed the existence of documented proof that Sharifi had been treated for serious mental illness in Iran. Given the "multitude of malingered symptoms he presented," Rosenzweig could not determine definitively whether Sharifi had a genuine mental disorder at the time of his evaluation. *Id*. at 142.

Also in August, the court held the evidentiary hearing on Sharifi's request for an interpreter. Several witnesses testified regarding Sharifi's English language abilities. On September 20, the

court granted Sharifi the use of an interpreter for all subsequent court proceedings.

From September 2002 to March 2003, Sharifi's counsel filed numerous motions. As of March, they had filed approximately 60 pretrial motions in total. Many of these motions pertained to the collection of evidence, including a December 2002 motion seeking funds for a ballistics expert. Similarly, a February 2003 motion sought the examination of files on a computer that had been seized from Sharifi following his arrest.

The same month, Sharifi's counsel filed a motion to dismiss his indictment arguing that his consular rights under the Vienna Convention had been violated. They contended that Sharifi had never been advised of his right to contact his consulate and that this constituted a structural error requiring dismissal. On the same ground, Sharifi's counsel also moved to preclude the State from seeking the death penalty. The court later denied these motions.

Also in February 2003, the State disclosed for the first time that it had collected testimony from jailhouse informants. The State had interviewed the informants and taken their recorded statements in October 2002.

In April, the court ordered that the trial would begin on May 5, 2003. In preparation for trial, the court held motion hearings on April 16 and 18. At the April 16 hearing, the State requested Rosenzweig's report on Sharifi's mental state. Defense counsel represented that the report was still in progress. In fact, Rosenzweig had informed counsel of her findings several months earlier.

Instead of turning over the report, Sharifi's counsel indicated that they were no longer challenging Sharifi's competence to stand trial. Further, they announced that Sharifi was no longer arguing not guilty by reason of mental disease or defect; he was pleading not guilty only.

At the April 16 motions hearing, defense counsel also challenged the State's use of jailhouse informant testimony. They explained that they had only recently learned that the State intended to rely on statements from the informants and that the State, citing security concerns, had not yet disclosed the names of the informants or given the defense copies of the recorded interviews. The State agreed that it would quickly disclose the informants' identities and turn over the tapes of their interviews.

By the next motions hearing on April 18, the State identified all five informants. It also turned over recordings of four of the five informants' interviews. And it promised that it would soon turn over a recording of the fifth informant's interview.

At the April 18 hearing, Sharifi's counsel moved to suppress the informants' testimony. They argued that they had insufficient time to review the tapes and prepare a defense ahead of the May 5 trial date. They also moved to suppress the State's ballistics evidence, arguing that the State still had not turned over all the ballistics evidence even though trial was just two weeks away.

Recognizing the importance of giving defense counsel adequate time to prepare their case, the court presented the State with two options. The first option was that the court would grant

defense counsel's motions to suppress the ballistics evidence and the informants' interviews. The second option was that the court would continue the case to allow defense counsel adequate preparation time. The State elected to continue the case. The court postponed the trial until October 27, 2003.

In August 2003, Sharifi's counsel again moved to dismiss the indictment, arguing that Sharifi's right to a speedy trial was violated. Although defense counsel acknowledged that Sharifi's numerous mental competency examinations created some delay, they argued that most of the delay was attributable to the State and its discovery behavior.

Ahead of the October trial date, Sharifi's counsel again moved to suppress evidence, this time DNA evidence collected from a shoe in Sharifi's possession in California. They asserted that they had learned of the DNA testing for the first time during an April 2003 hearing and that the State had not turned over any DNA testing reports or results. Because the State had failed to turn over evidence related to the DNA testing and trial was only four weeks away, Sharifi's attorneys argued that they did not have enough time to have the DNA independently tested and therefore the DNA evidence should be suppressed. At a status conference on October 3, the State moved to continue the October 27 trial date to give defense counsel time to independently test the DNA evidence. Sharifi's counsel objected to the continuance on speedy trial grounds and again requested suppression of the DNA evidence. Citing the need for a fair trial and the importance of the DNA evidence to the

State's case, the court granted the continuance. The court said that it would set a new trial date when the DNA testing was completed.

In January 2004, the Tutens moved to withdraw as Sharifi's counsel because he had filed a complaint against them with the Alabama State Bar. In the complaint, he alleged wrongdoing, mishandling of his case, violation of rules of professional conduct, and conspiring with the State of Alabama. They requested that the court set a hearing on their motion to withdraw. While the motion was pending, the Tutens continued to file motions on Sharifi's behalf. In January and February, they filed a motion to compel the State to send the DNA evidence to a defense expert to allow independent testing, which was granted, and sought funds for a mitigation expert. In addition, they filed an amended motion to dismiss for lack of a speedy trial.

The Tutens filed second and third motions to withdraw in February and March 2004, respectively. In these motions, they asked the court to allow them to withdraw without a hearing, stating that there had been a total breakdown in the attorney-client relationship. Invoking the court's statement that the case would be set for trial in fall 2004, they argued that their immediate withdrawal was needed so that the case could be ready for trial by that time. In March, the court allowed the Tutens to withdraw. It then appointed attorneys Larry Morgan and Lonzo Robinson to represent Sharifi. Because of a conflict, Robinson had to move to withdraw. In May 2004, the court appointed Alan Mann to represent Sharifi along with Morgan.

The court scheduled a motions hearing for June 2004. Before the hearing, Sharifi's new attorneys filed more than a dozen motions. At hearings on June 21 and 22, Sharifi's counsel again affirmed that he would not be pursuing the defense of not guilty by reason of mental disease or defect. They also affirmed that Sharifi would not further contest his competence to stand trial.

During the June hearings, the court disposed of several pending issues. It heard arguments from the parties about Sharifi's motion to dismiss for speedy trial violations. Sharifi's attorneys argued that the case should be dismissed because the State caused discovery delays. In response, the State argued that Sharifi's former attorneys, the Tutens, were preoccupied with another case that had been tried and retried during their representation of Sharifi. According to the State, the Tutens' preoccupation with their other case contributed to early delays in discovery. The State attributed other delays to the lack of an interpreter at many hearings and status conferences, which prevented the court from holding hearings on important issues. The State also argued that Sharifi had waited to raise many of the discovery issues until just before trial, which then forced the State to agree to continue the case to avoid having crucial evidence suppressed. For example, the State argued that Sharifi delayed raising issues related to ballistics analysis and the jailhouse informants despite knowing about the issues months before the hearing. The court denied the motion to dismiss. It set Sharifi's case for trial on September 13, 2004.

During an *ex parte* portion of the June 22 hearing, Sharifi's counsel asserted that to prepare the case for trial they needed the Tutens' files. By the time of this hearing, Sharifi had filed an action in federal court against the Tutens, the state court judge, and others. Sharifi's counsel explained that the Tutens were unwilling to hand over their original case files because they needed the files to defend the lawsuit. Mann and Morgan asked the court for funds to make copies of the Tutens' extensive files. The court granted their request.

Sharifi's attorneys continued to prepare their mitigation case. Building on work begun by the Tutens, Mann and Morgan sought funds to send mitigation expert Cyrus Johnston to Iran to build Sharifi's mitigation case. Despite acknowledging the difficulty in traveling to Iran given the political climate at the time, defense counsel also believed that there was a strong likelihood that failing to go to Iran to find mitigation evidence would amount to ineffective assistance of counsel severe enough to reverse a conviction. They referred to this as an "international catch-22." Doc. 11-3 at 67. The court granted the attorneys' request for funds to hire a mitigation expert and later approved mitigation investigation and travel funds up to $50,000.

At the end of June, two and a half months before the scheduled trial date, Sharifi's counsel moved to prohibit the imposition of the death penalty. They told the court that Johnston, their mitigation expert, reported that a full mitigation investigation would take at least six months. They reasserted Sharifi's right to a speedy

trial and emphasized that they did not consent to a continuance. Instead, they argued that because they were unable to conduct an adequate mitigation investigation, the court must prohibit the imposition of the death penalty or risk violating Sharifi's constitutional rights. The court denied this motion in August.

Leading up to the scheduled September trial date, defense counsel filed motions for several prisoners to be produced for Sharifi's trial, arguing that they were essential witnesses. The court granted the defense's motions and ordered the prisoners transported to the Madison County jail so that they would be available as witnesses during trial. None of these prisoners ultimately testified at Sharifi's trial.

Just before trial was set to begin on September 13, 2004, Sharifi's counsel moved for a continuance because they were missing Fatemeh Mazaree, Sharifi's mother and an essential witness, who had returned to Iran. The State did not object, and the court granted the motion for a continuance. Trial was reset for January 24, 2005.

Shortly after the trial was continued, defense counsel moved for a fourth evaluation of Sharifi's competence to stand trial, despite earlier representations that his competence was no longer being challenged. Although the court initially granted this motion, the order was later set aside based on the State's objections. The court nevertheless granted defense counsel's motion to allow another psychiatrist, Dr. Keith Caruso, to visit and evaluate Sharifi for the purpose of securing mitigation evidence.

At the beginning of January 2005, defense counsel moved to take Mazaree's deposition abroad in Turkey. They argued that it was necessary to take her deposition abroad because she previously had overstayed a visa in the United States and would not be allowed to reenter the country. The State objected, asserting that it would be unable to travel to Turkey for the deposition and thus would be unable to conduct the necessary cross-examination of the witness. The court denied the motion to take the deposition in Turkey.

Defense counsel then moved to dismiss the case based on their inability to depose Mazaree, which they said deprived Sharifi of an essential alibi witness. In the motion, defense counsel proffered the testimony that Mazaree would have given if called as a witness. According to the proffer, she would have testified that in December 1999 she spoke to both Sharifi and Smith Sharifi on the phone several times. The proffer stated that on December 16 Mazaree called Sharifi at a California phone booth, using the phone number 310-979-0225, and on the same day she called Smith Sharifi at her Huntsville apartment landline. The court denied the motion to dismiss.

Also in January, Sharifi's counsel again sought to bar the imposition of the death penalty because they were unable to conduct an adequate mitigation investigation. Since the court's previous ruling on this issue, Johnston, the mitigation expert, had tried and failed to get a visa to travel to Iran. Defense counsel also had tried to work with a Chicago law firm run by an Iranian national, but the

law firm's representative also was denied a visa to Iran. The court again denied this motion.

By the time Sharifi's trial finally began, his counsel had filed approximately 140 motions.

## B. Trial Proceedings

Sharifi's trial began on January 24, 2005, 61 months after his arrest. The trial lasted eight days. The State's theory at trial was that Sharifi purchased a gun on December 6, 1999, and used that weapon to shoot Smith Sharifi and Brown. It argued that the two victims were last seen alive on December 13, when they had a disagreement with Sharifi in a parking lot. The State argued that sometime between December 13 and 26, Sharifi murdered the victims and then traveled to California.

In the guilt phase, the State called more than two dozen witnesses. The witnesses included police officers, FBI agents from Los Angeles and Alabama, coroners, crime scene investigators, and forensic scientists from the Alabama Department of Forensic Science. The State also called the assistant manager for Smith Sharifi's Huntsville apartment, a pawn shop owner who testified that he had sold Sharifi the gun allegedly used in the murders, and another prisoner who testified that Sharifi had asked her to fabricate alibi testimony for him.

At trial, Sharifi presented testimony from three witnesses. The first witness was Aghashahabedin Aghaeimoghari ("Moghari"), an associate of Sharifi's in Alabama who testified by

24-11280                Opinion of the Court                19

deposition.[2] Moghari testified that Sharifi visited him on December 13 with his car packed, saying that he was leaving for California. Moghari also testified that Smith Sharifi visited him the following day looking for Sharifi.

Sharifi's second witness was Syed Shah, the manager of the apartments where Sharifi lived briefly after moving to California in December 1999, who also testified by deposition.[3] Shah testified that Sharifi arrived sometime between December 16 and 20. He also stated that the phone number 310-979-0225 matched a pay phone a few blocks from the apartment building.

Sharifi's third witness was Gholam Hossain Sharifi, Sharifi's father. He testified that on December 15, 1999, Sharifi called and asked him to call Sharifi back at the phone number 310-979-0225. Sharifi's father testified that ten minutes later he called the number and spoke to Sharifi, who was in California. The next day, Sharifi's father called the same number and again spoke to Sharifi, who was still in California. Shortly after their call ended, Sharifi's father called Sharifi's Huntsville apartment, and Smith Sharifi answered the phone. He asked Smith Sharifi why Sharifi had left. She answered that Sharifi was "no good" and then hung up. Doc. 11-8 at 191.

---

[2] Sharifi presented Moghari's testimony through a recorded deposition because Moghari, who had been in poor health, passed away before trial.

[3] The court permitted Shah, who lived in California, to testify by deposition so that he did not have to miss work for the trial.

At trial, Sharifi argued that the State had not proven beyond a reasonable doubt that he committed the murders. He asserted that his witnesses' testimony showed that by the time Smith Sharifi and Brown were murdered, he already had left Alabama for California.

The jury found Sharifi guilty of the murders of Smith Sharifi and Brown. The trial then moved to the penalty phase. At the penalty phase, the State called Smith Sharifi's brother and Brown's brother, who testified about the impact of their siblings' deaths.

Sharifi called only one witness: Johnston, the mitigation expert, who testified about his inability to gather any type of meaningful mitigation evidence in Sharifi's case. Johnston testified that as part of his investigation he had interviewed Sharifi's father. On cross examination, Johnston admitted that he had never attempted to call Sharifi's mother or talk with Sharifi's contacts in Huntsville, including the pastor at Sharifi's church and his coworkers. After hearing this testimony, the jury voted ten to two in favor of the death penalty. The trial court adopted this recommendation and sentenced Sharifi to death.

### C. Sharifi's Appeal

On direct appeal, Sharifi challenged his conviction and sentence. He argued, among other things, that the State violated his Sixth Amendment right to a speedy trial. He cited *Barker v. Wingo*, 407 U.S. 514 (1972), which sets out four factors for courts to consider when assessing whether a defendant's constitutional right to a speedy trial was violated: (1) the "[l]ength of delay," which must

be met to trigger the other factors; (2) "the reason for the delay;" (3) "the defendant's assertion of his right;" and (4) "prejudice to the defendant." *Id.* at 530.

Sharifi argued, based on the *Barker* factors, that his constitutional rights were violated. He argued that the length of the delay in bringing his case to trial was sufficient to trigger a full speedy trial analysis and that the delay was caused by the State's failure to cooperate in discovery, failure to comply with other trial court orders, and repeated requests for continuances. He contended that he had properly asserted his right to a speedy trial and that he was prejudiced by this delay for four reasons: (1) the delay negatively impacted his relationship with his defense counsel; (2) the delay prevented him from securing cooperation from Iran in preparing his defense; (3) the delay negatively impacted his mental health; and (4) the delay caused his mother to overstay her visa and have to return to Iran, preventing her from being able to give mitigation testimony.

The Alabama Court of Criminal Appeals ("ACCA") affirmed Sharifi's conviction, holding that his right to a speedy trial was not violated. *Sharifi*, 993 So. 2d at 922, 924. It agreed with Sharifi that the first and third *Barker* factors weighed in his favor: the 61-month delay in bringing the case to trial was presumptively prejudicial, and he properly asserted his right to a speedy trial. *Id.* at 924. But the second and fourth factors, the ACCA concluded, weighed against him. *Id.* at 922–24.

Regarding the reason for the delay, the ACCA determined that most of the delays were caused by Sharifi rather than the State. According to the ACCA, "[b]y far the vast majority of the delays were based on the numerous and lengthy motions filed by the defense." *Id*. at 924. Because "[d]elays occasioned by the defendant or on his behalf are excluded from the length of delay" and are "heavily counted against the defendant," the ACCA concluded that this factor weighed against Sharifi. *Id*. (citation omitted).

The ACCA also concluded that the delay had not prejudiced Sharifi. The court rejected Sharifi's argument that the delay negatively impacted his relationship with defense counsel, finding that the Tutens moved to withdraw not because of the delay, but because Sharifi had filed a complaint against them with the Alabama State Bar. It further found that the delay did not prevent him from securing cooperation from Iran, noting that "the United States has had no diplomatic relations with Iran since 1980." *Id*. And although Sharifi argued that the delay had negatively affected his mental state, the ACCA pointed to the multiple mental evaluations of Sharifi showing that he "was malingering and feigning his symptoms." *Id*. Lastly, the court concluded that Sharifi was not prejudiced even though his mother had been unable to testify because his father was available and testified at his trial. *Id*.

The court concluded its analysis by emphasizing the complexity of the case and finding that "the majority of the delays were due to the court's desire to make every resource available" to Sharifi before his trial. *Id*. Given the absence of prejudice and Sharifi's

own role in the delay, the ACCA determined that he was not denied his constitutional right to a speedy trial.[4] *Id.*

### D. Sharifi's Federal Habeas Petition

Sharifi timely filed a federal habeas petition raising several claims, including that his constitutional right to a speedy trial was violated.[5] The district court evaluated each of the claims and determined that Sharifi was not entitled to an evidentiary hearing or habeas relief. *Sharifi v. Raybon*, No. 5:17-cv-01924, 2024 WL 1199670, at *1 (N.D. Ala. Mar. 20, 2024). This Court granted Sharifi a certificate of appealability as to whether his Sixth Amendment right to a speedy trial was violated. This appeal followed.

### II. Standard of Review

We review *de novo* a district court's denial of a petition for a writ of habeas corpus. *Morrow v. Warden, Ga. Diagnostic Prison*, 886 F.3d 1138, 1146 (11th Cir. 2018).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our review of federal habeas petitions. *See* 28 U.S.C. § 2254(d). "AEDPA prescribes a highly deferential framework for evaluating issues previously decided in state court."

---

[4] Sharifi sought review of the ACCA's decision in the Alabama Supreme Court, which denied his petition. He then filed a petition for a writ of certiorari with the Supreme Court of the United States, which was denied. *Sharifi v. Alabama*, 555 U.S. 1010 (2008).

[5] Sharifi also sought post-conviction relief in Alabama state court. Because those proceedings are not relevant to the issues before us, we do not discuss them.

*Sears v. Warden GDCP*, 73 F.4th 1269, 1279 (11th Cir. 2023). According to AEDPA, a federal court may not grant habeas relief on a claim that was "adjudicated on the merits in [s]tate court" unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(d)(1), a state court decision is "contrary to" clearly established law if the court "applie[d] a rule that contradicts the governing law" articulated by the United States Supreme Court or the facts before the state court were "materially indistinguishable" from Supreme Court precedent but the court arrived at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To meet the unreasonable-application-of-law standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (citation modified). The decision must be "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This standard is "difficult to meet and . . . demands that state-court decisions be given the benefit of the doubt." *Raulerson v. Warden*, 928 F.3d 987, 996 (11th Cir. 2019) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)).

Under 28 U.S.C. § 2254(d)(2), we must defer to a state court's determination of facts unless its decision "was based on an

unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). "We may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (citation modified). We presume that a state court's factual determinations are correct, absent clear and convincing evidence to the contrary. *See Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc); 28 U.S.C. § 2254(e)(1).

On each claimed basis for relief, we review "the last state-court adjudication on the merits." *See Greene v. Fisher*, 565 U.S. 34, 40 (2011).

## III. Analysis

The United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Because the Sixth Amendment right to a speedy trial is undergirded by "unique policies," the "court must set aside any judgment of conviction, vacate any sentence imposed, and dismiss the indictment if it finds a violation of the defendant's right to a speedy trial." *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010).

A defendant's Sixth Amendment right to a speedy trial is "unique among the defendant's constitutional rights." *United States v. Vargas*, 97 F.4th 1277, 1286 (11th Cir. 2024). The right to a speedy trial "is a more vague concept than other procedural

rights," given the justice system's conflicting needs to be both "swift [and] deliberate." *Barker*, 407 U.S. at 521. Because both the government and the accused may need time to build their respective cases, "pretrial delay is often both inevitable and wholly justifiable." *Doggett v. United States*, 505 U.S. 647, 656 (1992). The Supreme Court has identified the time needed to "collect witnesses against the accused" and "oppose [the defendant's] pretrial motions" as examples of justifiable delay. *Id.* This right is "consistent with delays and depends upon circumstances." *Barker*, 407 U.S. at 522. Therefore, how much delay is permissible is determined "on an ad hoc basis," and any inquiry into a speedy trial claim "necessitates a functional analysis of the right in the particular context of the case." *Id.* at 522, 530.

The speedy trial right is also unique because "it does not always serve the defendant's interests to assert the right." *Vargas*, 97 F.4th at 1286. In fact, sometimes a delay may benefit the defendant. *Id.* As the Supreme Court has recognized, purposeful delay "is not an uncommon defense tactic." *Barker*, 407 U.S. at 521. Thus, unlike other rights, "deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself." *Id.*

In *Barker*, the Supreme Court established four guiding factors for "courts [to] assess in determining whether a particular defendant has been deprived of his right" to a speedy trial. 407 U.S. at 530. Those factors are: (1) the "[l]ength of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right," and (4) "prejudice to the defendant." *Id.* In considering these factors,

courts must engage in a "difficult and sensitive balancing process." *Id.* at 533. "And unless the first three factors weigh heavily against the government, the defendant is generally required to show actual prejudice to receive relief." *United States v. Louis*, 146 F.4th 1328, 1337 (11th Cir. 2025).

Importantly, the four factors "have no talismanic qualities," and no factor is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. We have characterized analysis under the *Barker* factors as "a sliding scale, with few hard and fast rules." *Vargas*, 97 F.4th at 1287.

Here, Sharifi raised a speedy trial claim in his direct criminal appeal, and the ACCA rejected the claim. He argues that the ACCA's decision is not entitled to AEDPA deference because it involved both an unreasonable application of clearly established law—the *Barker* factors—and was based on an unreasonable determination of the facts. Therefore, Sharifi asserts, his speedy trial claim is entitled to *de novo* review on the merits. For the following reasons, we conclude that Sharifi has failed to overcome AEDPA deference under either § 2254(d)(1) or § 2254(d)(2). He thus is not entitled to habeas relief.

### A. The ACCA did not unreasonably apply controlling Supreme Court precedent.

Sharifi argues that the ACCA unreasonably applied the *Barker* factors. Specifically, he asserts that the ACCA incorrectly attributed the cause of the delay to his own actions rather than to the

State's actions, failed to weigh the length of the delay and his timely assertion of his right heavily in his favor, and unreasonably assessed the prejudice caused by the delay. We do not find these arguments persuasive and conclude that the ACCA did not unreasonably apply the *Barker* factors in this case. We discuss the reasonableness of the ACCA's determination for each *Barker* factor in turn.

We begin with the first factor, the length of the delay. This factor "serves a triggering function: it must first be satisfied for the court to analyze the other factors." *United States v. Oliva*, 909 F.3d 1292, 1298 (11th Cir. 2018). Once this threshold has been met, the court should consider how much longer the pretrial delay "extended beyond the bare minimum necessary to show presumptive prejudice." *Villarreal*, 613 F.3d at 1350 (citation modified). As the length of the delay increases, this factor weighs more heavily against the government. *Id.* For purposes of this factor, a delay exceeding one year is "presumptively prejudicial." *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006) (citation omitted). However, even if a defendant establishes a sufficiently lengthy delay to trigger the other *Barker* factors, it "does not necessarily mean that factor weighs heavily against the Government; the two inquiries are separate." *Oliva*, 909 F.3d at 1298.

The ACCA agreed with Sharifi that his 61-month delay was presumptively prejudicial, citing Alabama state court cases where shorter delays had met this threshold, and continued to an analysis

of the other *Barker* factors.[6] *Sharifi*, 993 So. 2d at 922. On appeal, Sharifi argues that though the ACCA "technically credited" him this first factor, the court failed to accept that the factor weighed "powerful[ly]" and "heavily" in his favor. Appellant's Br. 30.

Sharifi is correct that the degree to which this factor weighs against the government "incrementally increas[es]" as "the delay becomes increasingly protracted." *Villarreal*, 613 F.3d at 1350. But this is not the end of the analysis. The first factor is "[c]losely related" to the second. *Barker*, 407 U.S. at 531. And "even when the length of delay is presumptively prejudicial, it does not weigh heavily against the government unless the second factor, the reason for the delay, also weighs against the government." *United States v. Ogiekpolor*, 122 F.4th 1296, 1305 (11th Cir. 2024). Therefore, even though the length of delay in this case was quite long, this factor should be weighed *heavily* against the State only if the second factor also weighs against it. So we must turn to the second factor to determine how heavily the first factor weighs against the State.

The second factor is the reason for delay. The State bears the burden of establishing valid reasons for the delay. *Villarreal*, 613 F.3d at 1351. In analyzing this factor, "we weigh the relative

---

[6] "The Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial." *United States v. Knight*, 562 F.3d 1314, 1323 (11th Cir. 2009). The ACCA agreed with Sharifi's calculation of his delay as lasting 61 months, and no party challenges this calculation on appeal.

culpability of the government and the defendant for the delay." *United States v. Machado*, 886 F.3d 1070, 1079 (11th Cir. 2018).

Different kinds of delay are accorded different weights. When the government deliberately delays the trial to "hamper the defense," this factor should be "weighted heavily against the government." *Barker*, 407 U.S. at 531. Comparatively, a neutral reason such as "negligence or overcrowded courts" is weighed less heavily against the government. *Id.* And valid reasons, "such as a missing witness" will "justify appropriate delay." *Id.* Importantly, the "government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay." *Villarreal*, 613 F.3d at 1351; *see also Ingram*, 446 F.3d at 1337 ("[A] defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay."). "The responsibility for a delay requested by [the defendant] does not rest with the government." *Louis*, 146 F.4th at 1338 (citation modified).

In analyzing the second factor, the ACCA listed several "helpful" dates in Sharifi's pretrial proceedings and determined that "[b]y far the vast majority of the delays were based on the numerous and lengthy motions filed by the defense." *Sharifi*, 993 So. 2d at 922, 924. Sharifi argues that the ACCA unreasonably applied *Barker* because it "either did not consider or unreasonably discounted the evidence of the prosecution's ongoing, blatant years-long refusal to turn over evidence, and it failed to recognize that this evidence established that this factor [] weighed in Sharifi's favor." Appellant's Br. 30 (citation modified). Thus, Sharifi argues, the ACCA

determination that the second *Barker* factor weighed against him was an unreasonable application of the law.

Time needed to address extensive pretrial motions is a valid reason for delay. *See United States v. Schlei*, 122 F.3d 944, 987–88 (11th Cir. 1997) (concluding that there was no speedy trial violation where a major reason for the delay was the over 100 pretrial motions filed by the defendant and his codefendants); *see also United States v. Twitty*, 107 F.3d 1482, 1490–91 (11th Cir. 1997) (holding that where "the delay was the result of: numerous pretrial motions; the illness of an essential government witness; [a co-defendant's] substitution of counsel; and scheduling conflicts," there was no speedy trial violation). Here, even accepting that the State contributed to some of the delay, defense counsel still filed approximately 140 motions, which certainly delayed the proceedings. Sharifi's counsel acknowledged at a June 2004 hearing that "of course, there are delays incumbent with motions that the defense files." Doc. 11-3 at 43. Where the defendant and "the government [both] bear some responsibility for putting off the trial," the second *Barker* factor does not ordinarily weigh against the government. *See United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999); *see also United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003) (concluding that the second *Barker* factor didn't weigh heavily against the government where "there [was] no indication that the prosecution was any more responsible than the defense for the delay").

Given these facts, the ACCA's weighing of the second *Barker* factor against Sharifi is not "so obviously wrong that its error lies

beyond any possibility for fairminded disagreement." *Shinn*, 592 U.S. at 118 (citation modified). Because we cannot say that the ACCA misapplied the second *Barker* factor in weighing it against Sharifi, we cannot say that the ACCA erred in not weighing the first factor heavily against the government. *See Ogiekpolor*, 122 F.4th at 1305.

We turn now to the third factor: the defendant's assertion of his right to a speedy trial. The defendant's assertion of his right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32. Generally, the weight attached to this assertion "will differ with the circumstances of the defendant's demand." *Villarreal*, 613 F.3d at 1354. For instance, courts may weigh the "frequency and force" of a defendant's invocations of his right to a speedy trial. *Barker*, 407 U.S. at 529. "These assertions, however, must be viewed in the light of [his] other conduct." *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986).

The ACCA concluded that Sharifi adequately asserted his right to a speedy trial. *Sharifi*, 993 So. 2d at 924. In support of this conclusion, it cited Sharifi's September 2000 handwritten note requesting a speedy trial, as well as defense counsel's October 2001 objection to the case being moved to the administrative docket, which included a speedy trial assertion, and later motions for a speedy trial. *Id*. But as with the first factor, Sharifi argues that the ACCA did not give his invocation of his speedy trial right sufficient weight in his favor.

We acknowledge that Sharifi asserted his right to a speedy trial frequently and forcefully. But that alone is not dispositive. The Supreme Court has held that the third factor does not weigh in a defendant's favor—even when they repeatedly moved for dismissal on speedy trial grounds—where those assertions were accompanied by "frivolous petitions" and "repetitive and unsuccessful motions." *Loud Hawk*, 474 U.S. at 314–15 (describing the defendants' speedy trial claims as "reminiscent of Penelope's tapestry").

Sharifi's speedy trial assertions were accompanied by dozens of time-consuming pretrial motions. And many of these motions were duplicative; for example, he filed repeated motions for mental evaluation and for a jury determination of his mental state. The record also contains evidence that he may have been exaggerating his psychiatric symptoms to "avoid[] trial and be[] found incompetent." Doc. 11-13 at 67. Despite this evidence, which may suggest Sharifi was actively trying to delay trial, the ACCA nonetheless found that this factor weighed in his favor, though it didn't explicitly confer extraordinary weight. Viewing the record as a whole, we cannot say that the ACCA erred in the weight it accorded this factor.

The fourth and final factor is prejudice to the defendant. A defendant ordinarily must show actual prejudice unless "the first three *Barker* factors weigh *heavily* against the Government." *Vargas*, 97 F.4th at 1288 (citation modified) (emphasis in original). "Prejudice is assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Louis*, 146 F.4th at 1339

(citation modified). In *Barker*, the Supreme Court explained that the speedy trial right was particularly intended to "prevent oppressive pretrial incarceration," "minimize anxiety and concern of the accused," and "limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*.

Because Sharifi failed to show that the first three *Barker* factors weighed heavily against the government, he must show actual prejudice. *See Louis*, 146 F.4th at 1337. Before the ACCA, Sharifi argued that he was prejudiced because (1) the delay harmed his relationship with his defense counsel (the Tutens); (2) the delay prevented him from securing cooperation from Iran in preparing his defense; (3) the delay negatively impacted his mental health; and (4) the delay caused his mother to overstay her visa such that she was forced to return to Iran, which prevented her from providing mitigation testimony. The ACCA concluded that Sharifi was not prejudiced for any of these reasons. *Sharifi*, 993 So. 2d at 924. We consider each reason next.

Regarding Sharifi's first reason, the ACCA concluded that the Tutens moved to withdraw as Sharifi's counsel because Sharifi filed a complaint against them with the Alabama State Bar. *Id*. This conclusion is supported by their motions to withdraw. In their motion, the Tutens explained that although "their relationship was rocky at times due to cultural differences and language barriers, Counsel believed that a good attorney-client relationship existed."

Doc. 11-15 at 113. But then Sharifi's complaint with the state bar "resulted in a breakdown of the attorney-client relationship." *Id*. at 114. According to the motion, "appointing different counsel at [the time of filing] would not adversely affect the defendant's case." *Id*. (citation modified). Based on these statements, the ACCA did not unreasonably apply *Barker* in concluding that Sharifi's defense was not prejudiced by the substitution of counsel.

Concerning Sharifi's second reason, the inability to cooperate with Iran, the ACCA explained that because the United States had not had diplomatic relations with Iran since 1980, the pretrial delay was not the reason for the Iranian government's lack of cooperation. *Sharifi*, 993 So. 2d at 924. Sharifi has offered no evidence to suggest that the Iranian consulate would have provided meaningful assistance had his trial occurred sooner, nor has he disputed the long-running lack of diplomatic relations between the United States and Iran that existed at the time. We therefore see little support for Sharifi's position that Iran's lack of cooperation was caused or impacted by the delay—certainly not enough to conclude that the ACCA's application of *Barker* was unreasonable.

As to Sharifi's third reason, the ACCA rejected Sharifi's argument that his lengthy pretrial incarceration impacted his mental wellbeing. It referenced the experts' mental evaluations finding that he was "malingering and feigning his symptoms." *Sharifi*, 993 So. 2d at 924. This determination is well supported by the record. Although Sharifi's medical records from Iran showed that he had been previously treated for psychiatric conditions, Clinger, Nagi, and

Rosenzweig all saw indications that he was faking or exaggerating his symptoms. For example, Rosenzweig, the third professional to evaluate Sharifi, determined in 2002 that he was likely "deliberately feigning incompetence" and presented a "multitude of malingered symptoms." Doc. 11-17 at 140, 142. Evidence in the record thus supports the ACCA's conclusion that Sharifi's mental health issues were not caused or exacerbated by the delay and that this was not a source of prejudice. The ACCA's consideration of this evidence was not an unreasonable application of *Barker*.

Finally, the ACCA determined that the absence of Sharifi's mother from trial did not prejudice his defense because his father was present and testified at trial. *Sharifi*, 993 So. 2d at 924. The ACCA correctly observed that Sharifi's father testified about the same phone conversations that his mother would have. Although Sharifi argues that he was prejudiced by not having his mother's mitigation testimony, there is no evidence that Sharifi's counsel made any attempt to take her mitigation testimony or identify other mitigation leads. Sharifi's mitigation expert, the only person who testified on his behalf in the sentencing phase, admitted that he never attempted to call Sharifi's mother in Iran or talk with Sharifi's contacts in Alabama. Furthermore, even if we assume for arguments' sake that Sharifi is right that the State caused the delay, Sharifi's counsel could have recorded a deposition of his mother before she returned to Iran. They made no effort to do so. Therefore, we cannot find unreasonable the ACCA's conclusion that Sharifi was not prejudiced by his mother's return to Iran and resulting absence from trial.

Ultimately, Sharifi has failed to show that the ACCA's denial of his speedy trial claim was "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The ACCA appropriately weighed the first and third *Barker* factors in Sharifi's favor. The record supported the court's conclusion that the second and fourth factors did not weigh in his favor. We have previously held that there was no speedy trial violation where factors one and three weighed in favor of the defendant, but on factors two and four the cause was partly attributable to the defendant, and he was unable to show prejudice. *See Schlei*, 122 F.3d at 987–88. Thus, the ACCA's similar analysis was not an unreasonable application of the *Barker* factors. Sharifi has not overcome AEDPA deference under § 2254(d)(1).

**B. The ACCA's decision did not depend on an unreasonable determination of the facts.**

Sharifi argues that he satisfied § 2254(d)(2) by showing that the ACCA's decision relied on an unreasonable determination of the facts considering the evidence presented. Specifically, he disputes the ACCA's factual findings as to the cause of the delay, first contesting the ACCA's determination that "[b]y far the vast majority of the delays were based on the numerous and lengthy motions filed by the defense."[7] *See Sharifi*, 993 So. 2d at 924. Second, he

---

[7] Sharifi emphasizes that the ACCA counted his motion to dismiss for violation of his speedy trial rights among those contributing to the delay. He argues that this was unreasonable and, in fact, contravened *Barker*, which requires that a defendant's assertion of his speedy trial right be weighed in his favor. But this

38                        Opinion of the Court                    24-11280

disputes the ACCA's finding that the trial court "took every pre-caution to ensure that Sharifi was granted a fair trial" and "the majority of the delays were due to the court's desire to make every resource available to Sharifi." *Id.* To overcome the presumption that the ACCA's factual determinations are correct, Sharifi must present clear and convincing evidence to the contrary. *See Pye*, 50 F.4th at 1035. He has failed to do so for either of the challenged factual determinations.

First, Sharifi argues that it was unreasonable for the ACCA to find that most of the delay was caused by motions filed by the defense. He contends that the defense motions related to his mental evaluations and his changes in counsel—the main causes of delay according to the ACCA—represented "a minimal portion of the delay" and should not have been held against him. Appellant's Br. 26. He argues that the State's repeated delays in turning over discovery, instead, caused most of the delay.

Sharifi's argument that the ACCA inappropriately held his motions for mental examinations and for new counsel against him is unavailing. At the outset, we think it is by no means clear from

---

argument mischaracterizes the ACCA's analysis. In evaluating the second *Barker* factor, the ACCA listed several "helpful" dates in Sharifi's case, including the date this motion to dismiss was filed. *Sharifi*, 993 So. 2d at 922–24. The ACCA did not say that each of these motions should be weighed against Sharifi—in fact, several of the listed dates were for motions filed by the State. *Id.* And the ACCA did in fact weigh Sharifi's assertion of his speedy trial right in his favor when evaluating the third *Barker* factor. *Id.* at 924. We therefore reject this argument.

the ACCA's decision that it actually did hold these motions against him. Regardless, Sharifi downplays the extent to which his actions and those of his counsel contributed to the delay. Of course, it was in no way improper for Sharifi to seek mental examinations if there was a good faith basis for them. And he was well within his rights to move for new counsel if there was a serious breakdown in the attorney-client relationship. Here, though, Sharifi's counsel filed four separate motions for mental evaluations (the last one after representing to the court that they would not file another one), even though each of the professionals who evaluated him found it likely that he was feigning his symptoms, or at least their severity. And by not merely moving for new counsel, but rather going so far as to file a lawsuit and a State Bar complaint against his former attorneys, he made it difficult for his replacement counsel to obtain copies of his case materials: His former attorneys needed to keep the originals for their defense. Given these facts, it was not unreasonable for the ACCA to find that these motions significantly contributed to the delay.

And even if we exclude Sharifi's motions for mental examinations and new counsel, we cannot say that it was unreasonable for the ACCA to find that the defense's motions practice caused much of the delay. Excluding the mental examination and new counsel motions, defense counsel still filed more than one hundred motions before trial, some of which were unnecessarily duplicative. And Sharifi requested the district court hold a pretrial hearing on each motion. Sharifi's counsel even acknowledged that "of course, there are delays incumbent with motions that the defense

files." Doc. 11-3 at 43. On this record, Sharifi has failed to present clear and convincing evidence that the ACCA erred in determining that most of the delay was caused by defense motions or that the ACCA improperly held his motions for mental examinations and new counsel against him.

Sharifi also attacks the ACCA's finding that the defense's motions practice caused the majority of the delay by arguing that the delay was caused instead by the State's repeated delays in turning over discovery materials. But the State disputed its responsibility for the delays in discovery. It maintained that some of the discovery delays could be attributed to the Tutens' preoccupation with another case while representing Sharifi. It also pointed out that defense counsel repeatedly raised these discovery issues shortly before trial was to begin, forcing the State to continue the case to avoid having crucial evidence suppressed. But even granting Sharifi that the State did not always turn over discovery materials promptly, and thus the State contributed to the delay, this is not enough to overcome AEDPA deference. It does not matter if "we would have reached a different conclusion in the first instance." *Brumfield*, 576 U.S. at 313–14 (citation modified). Sharifi has failed to present clear and convincing evidence that the ACCA unreasonably attributed most of the delay to him.

Second, Sharifi argues that the ACCA incorrectly found that the trial court "took every precaution to ensure that [he] was granted a fair trial" and "the majority of the delays were due to the court's desire to make every resource available to [him]." *Sharifi*,

993 So. 2d at 924. He says that, to the contrary, the record shows that "the trial was delayed to make sure every resource was available to the State" based on two of the trial continuances. Appellant's Br. 28. Sharifi again fails to present clear and convincing evidence to support his argument.

Sharifi points first to the continuance granted in April 2003. The trial court granted this continuance after defense counsel moved to suppress testimony from jailhouse informants whom the State identified just a few weeks before the scheduled trial date, as well as previously undisclosed ballistics evidence. Rather than allowing the trial to go forward as previously scheduled, the trial court recognized the importance of giving Sharifi's counsel "a fair chance at defending" him. Doc. 11-2 at 49. The court therefore presented the State with two options: either the court would suppress the evidence, which would have included all ballistics evidence, or it would continue the trial. The State elected a continuance, which gave defense counsel the opportunity to prepare for the new witnesses and evidence.

Sharifi next points to the October 2003 continuance, which was granted after defense counsel moved to suppress DNA evidence. Rather than let the court suppress the evidence, the State moved to continue the trial to allow the defense time to independently test the DNA. The court determined that the DNA evidence was "very important to the fair trial of this case" and granted the continuance to allow the defense time to have the evidence retested. Doc. 11-2 at 71. With both continuances, the trial court

arguably sought to balance Sharifi's ability to build his case with the State's need to present important evidence.

Beyond these two continuances, the trial court's actions did not contradict the ACCA's finding that the court sought to grant Sharifi a "fair trial" and make resources available to him. *Sharifi*, 993 So. 2d at 924. The court granted several mental competency evaluations and approved funds for travel to California and Iran. The court also granted Sharifi a continuance in September 2004 to give his counsel time to locate his mother, a potential alibi witness.[8] In combination with the court's rationales for the first two continuances, these facts cut against Sharifi's narrative that the trial court gave preference to the State leading up to trial. "[E]ven if it is debatable, it [was] not unreasonable" for the ACCA to conclude that the trial court "took every precaution to ensure that Sharifi was granted a fair trial" and that "the majority of the delays were due to the court's desire to make every resource available to Sharifi." *Wood v. Allen*, 558 U.S. 290, 303 (2010); *Sharifi*, 993 So. 2d at 924.

---

[8] Sharifi argues that the proposition that the court desired to "make every resource available" to him has been undermined because "the court denied counsel's motion to depose [] Sharifi's mother" in Turkey. Appellant's Br. 29. It is true that the court did not grant this motion. But it made that ruling after the State objected, arguing that it would have been unable to attend the deposition and cross-examine the witness. Furthermore, Sharifi's mother would have given alibi testimony similar to that offered by Sharifi's father, who did testify at trial. Given these circumstances, we cannot say that the court's denial of Sharifi's motion to depose his mother in Turkey provides clear and convincing evidence contrary to the ACCA's determinations.

In sum, Sharifi's challenged factual determinations have sufficient support in the record, and he has failed to point to clear and convincing evidence to the contrary. We thus conclude that the ACCA's decision was not based on an unreasonable determination of the facts under § 2254(d)(2).

## IV. Conclusion

We do not deny that Sharifi experienced a significant delay between his arrest and trial. But AEDPA's standard is "difficult to meet" and demands deference to the state court's determinations. *Richter*, 562 U.S. at 102. For the reasons we have explained, we conclude that Sharifi has failed to meet this rigorous standard. Therefore, we must defer to the Alabama Court of Criminal Appeals. The district court's denial of habeas relief is **AFFIRMED**.